**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| SHIRLEY A. CARPIN, as Executor of the Estate of SHIRLEY A. HILSTER, deceased, and CHARLES W. HILSTER, JR., Individually, | ) ) ) ) | |
| Plaintiff, | ) ) | Civil Action No. 2:20-CV-1537-MJH |
| v. | ) ) | |
| AIR & LIQUID SYSTEMS CORPORATION, individually and as successor-in-interest to Buffalo Pumps, Inc., et al., | ) ) ) ) | |
| Defendants. | ) | |

**REPLY MEMORANDUM OF LAW IN SUPPORT OF MOTION OF DEFENDANT
AIR & LIQUID SYSTEMS CORPORATION FOR SUMMARY JUDGMENT**

Defendant Air & Liquid Systems Corporation, successor-by-merger to Buffalo Pumps,

Inc. (collectively, "Buffalo") respectfully submits this reply memorandum of law in support of

its motion for summary judgment.

**A. Buffalo is not liable for external gaskets.**

Plaintiffs' arguments that Mr. Hilster was exposed to asbestos from a product for which

Buffalo is responsible are fatally flawed because they fail to acknowledge that there were two

types of gaskets that were used on or near pumps.  As Buffalo explained in its original motion

papers, one was an *internal* "casing" gasket used to seal the pump itself.  Those gaskets were

supplied by Buffalo with the pump.  The other type of gasket was used by the Navy to seal

between one piece of piping or equipment and another.  (Because those items were joined at

flanges, these *external* gaskets are sometimes referred to as "flange" gaskets.)  Buffalo did not

supply those external gaskets to the Navy.  The distinction is critical because Mr. Hilster never

worked with – indeed, there is no evidence he ever even saw – an *internal* gasket on a Buffalo

1

pump.  Rather, as a pipefitter, Mr. Hilster's only job with respect to equipment was that he sometimes helped connect or disconnect it.  He did not open the equipment, and he did not work on it once it had been opened, and there is no suggestion in the record that he was around others who were opening or working on pumps.

As a consequence, plaintiffs' sweeping generalizations about gaskets and pumps are irrelevant, because it is clear that those statements refer only to *internal* gaskets of the type Mr. Hilster never encountered.  For instance, plaintiffs claim that "Buffalo pumps *incorporated* asbestos-containing gaskets and packing[1] from the 1940s to the 1980s.  In fact, virtually all of the pumps Buffalo manufactured for the Navy *contained* asbestos gaskets and packing.  Buffalo considered asbestos-containing gaskets and packing to be *component parts* of its pumps."  (Pl. Opp. at 3 [citations omitted; emphasis supplied]).  Each of these statements (and the testimony which plaintiffs cite to support them) makes clear that plaintiffs are arguing a point Buffalo does not dispute – *i.e.*, that some of its pumps were supplied with asbestos-containing *internal* gaskets.  At the same time, as plaintiffs concede, "Buffalo also supplied pumps . . . *which did not*

---

[1] Despite the sprinkling of references to the material throughout their brief, plaintiffs nowhere suggest that there is any evidence that Mr. Hilster ever encountered any packing – another internal item – associated with a Buffalo pump.  Likewise, while plaintiffs make various claims about pumps having been externally insulated with asbestos and claim that Mr. Hilster "would have" disturbed such materials, they offer no testimony or documentation establishing that any Buffalo pump aboard any submarine on which he worked was externally insulated, with asbestos-containing materials or otherwise.

The imprecision that characterizes much of plaintiffs' Opposition is further illustrated by their outrageous assertion (complete with italics) that "Buffalo acknowledges that there may have been as many as *400 Buffalo pumps* aboard the submarines identified by Mr. Hilster."  (Pl. Opp. at 20).  They offer no citation for this assertion; nor does any exist.  Buffalo has made no such "acknowledgment," and there is not a shred of evidence to support plaintiffs' suggestion that there were more than a few Buffalo pumps on any of the submarines at issue.  In fact, it appears this statement was copied from a brief relating to another defendant.

*utilize asbestos-containing materials."* (Pl. Opp. at 3 n.2 [emphasis supplied]).[2]  What Buffalo does not admit, and what plaintiffs fail to provide any evidence of, is that Buffalo supplied any *external* gaskets, either with original equipment or as replacements.  Nor does Buffalo concede that any external gaskets Mr. Hilster might have encountered near Buffalo pumps contained asbestos.

Because Buffalo did not supply any of the external gaskets plaintiffs allege gave rise to Mr. Hilster's asbestos exposure, plaintiffs may under *Air & Liquid Systems Corp. v. DeVries* recover only if they can establish that:  (i) Buffalo specified or directed the use of the external gaskets; (ii) Buffalo incorporated an asbestos-containing external gasket in its equipment, knowing that it would be necessary to replace the gasket with an identical or similar asbestos-containing product; or (iii) Buffalo's pump could not function without the use of an asbestos-containing external gasket.  139 S. Ct. 986, 995-96 (2019).  While plaintiffs broadly acknowledge this requirement, they do not make even a passing attempt to meet the burden *DeVries* imposes on them.  They point to no evidence that Buffalo "specified" or "directed" the use of asbestos-containing external gaskets (or, indeed, of any external gaskets at all); rather, Mr. Hilster's own testimony was that the type of gasket material used to seal between piping and pumps was dictated by the shipyard's plans, rather than by any specification or instruction from pump makers.[3]  Nor do plaintiffs show that Buffalo "incorporated" external asbestos gaskets in its pumps; in fact, any such suggestion would be a *non sequitur*.  Lastly, plaintiff have pointed to

---

[2] *See also* Exhibit 10 to Pl. Opp., at 5 (Buffalo interrogatory response stating that "Buffalo Pumps has located documents that suggest that Buffalo Pumps supplied pumps for the intended use aboard [15 of the submarines at issue].  These records reflect that *the pumps supplied for use aboard these submarines contained no asbestos-containing consumable parts. . . .*") (emphasis supplied).
[3] Hilster Dep Vol 6 (Exhibit B to Buffalo's Motion) 31:8-18; 33:6-12.

no evidence that Buffalo's pumps would in any way have been rendered unable to function without external gaskets that contained asbestos, particularly since it did not use asbestos external gaskets when testing pumps in its own facility, and Mr. Hilster testified that both asbestos and non-asbestos external gaskets were used at Electric Boat generally.[4]

In tacit recognition of the absence of such evidence relating to external gaskets, plaintiffs instead make myriad assertions about *internal* gaskets. As part of this misleading bait-and-switch, they claim their expert, Captain Woodruff, "explained that Buffalo and other equipment manufacturers for the Navy 'utilized asbestos gaskets . . . in their designs and manufacturing.'" (Pl. Opp. at 4). Woodruff could only have been referring to internal gaskets, since he admitted that Buffalo did not "utilize" external gaskets at all; rather, Electric Boat obtained external gaskets from sources other than pump manufacturers, and he had seen nothing to suggest Buffalo supplied any external gaskets for any of Mr. Hilster's submarines.[5] As a result, neither of the cases plaintiffs cite in support of their assertions regarding the impact of *DeVries – Dennis v. Air & Liquid Systems Corp.* or *Data v. A.O. Smith Corp.* – is apposite, because in both of those cases plaintiffs were Navy sailors who testified they removed *internal* gaskets from pumps, and plaintiffs produced evidence that defendants had supplied those gaskets.

Even if there were some evidence to suggest that Mr. Hilster at some point encountered an internal gasket on a Buffalo pump, Woodruff's testimony is flatly inconsistent with plaintiffs' attempt to suggest that all such gaskets were asbestos-containing. He had "no idea" whether the internal gaskets on Buffalo pumps on the submarines at issue were asbestos-containing or some other type, would "have to look at the drawings, the pump drawings" to see what kind of gasket

---

[4] Hilster Dep Vol 2 (Exhibit D to Buffalo's Motion) 116:3-8.
[5] Woodruff Dep. (Exhibit F to Buffalo's Motion) 38:17-39:1.

was used, and had never seen a pump casing gasket made of cork or rubber.[6]  In fact, the internal gaskets in the pumps Buffalo supplied for the vast majority of the submarines on which Mr. Hilster worked were made of one of those two materials, and not from asbestos.[7]

Plaintiffs attempt to dispense with the entire issue of pumps that had non-asbestos internal gaskets by simply declaring that "[t]he testimony of Mr. Hilster does not suggest that he worked on these non-asbestos containing pumps."  (Pl. Opp. at 3 n.2).  But it also does not suggest he did not.  In fact, his testimony provides no information whatsoever regarding what kind of Buffalo pumps he might have encountered, on which submarine(s) that might have occurred, or what any encounter consisted of.  The only citation plaintiffs offer for their statement that "[o]ne of the brands of pumps Mr. Hilster specifically recalled removing gasket material from was Buffalo pumps" (Pl. Opp. at 2) is to a snippet of his deposition in which neither the question nor the answer mentioned asbestos at all.  In response to the next question, Mr. Hilster conceded that "for any of those pumps, meaning Warren Pumps or Buffalo Pumps or whomever else's pumps . . . [he] would not be able to say, listen, I know that on the *Ethan Allen* submarine that there were two Warren Pumps that I removed gaskets on.  That is a level of specificity that [he] can't provide. . . ."[8]  There is, in short, no evidence that Mr. Hilster ever encountered an asbestos-containing gasket located near a Buffalo pump.

**B.  <u>Maritime law applies</u>.**

Much of plaintiffs' argument on choice of law issues seems to be directed at some defendant other than Buffalo.  Plaintiffs are at pains to argue that Connecticut law, rather than Pennsylvania law, should govern their claims against Buffalo.  But Buffalo never argued for the

---

[6] Woodruff Dep. (Exhibit F to Buffalo's Motion) 53:22-55:6.
[7] Kraft Decl. (Exhibit A to Buffalo's Motion) ¶¶ 21-25.
[8] Hilster Dep Vol 3 (Exhibit 4 to Pl. Opp.) 35:14-23.

application of Pennsylvania law (or any other state's law, for that matter) to those claims. Rather, it argued that maritime law should govern those claims.

Plaintiffs' only real answer to Buffalo's position is to point to a single district court opinion – *Coach v. Armstrong Int'l, Inc.* – which applied state law to alleged take-home exposure from a shipyard. In that case, the court simply noted that the laundering by plaintiff of her ex-husband's clothes occurred in her home – and thus was what the court deemed "land-based work" – and declared that single fact was dispositive. The court did not cite any appellate authority for its conclusion, nor did it even purport to grapple with either the realities of the exposure scenario or the policies underlying maritime law.

This one-dimensional analysis is seriously flawed. First and foremost, as Buffalo demonstrated in its original motion papers and plaintiffs have failed to address, the Buffalo pumps plaintiffs claim were defective were located aboard Navy nuclear submarines being built and maintained at Electric Boat. The pumps were delivered from Buffalo to the shipyard, and worked on there by Navy and Electric Boat personnel. Buffalo had no communication with Mrs. Hilster, nor did she see any of the documentation regarding the pumps. Buffalo could only have communicated to her the warnings plaintiffs claim should have been given through the Navy or Electric Boat. Both the design of the pump and all written information relating to it were specified, reviewed and approved by the Navy, for use by Navy personnel or those of its shipyard contractors.

Ultimately, both the *Coach* court and plaintiffs hinge the choice of law issue on geographic happenstance. During most of the time Mr. Hilster was employed by Electric Boat, the family lived in Connecticut, but for a portion of that time Mr. Hilster was assigned instead to work on a submarine at the Portsmouth Naval Shipyard, which, despite its name, was located not

in Portsmouth, New Hampshire, but in Kittery, Maine.  As Mr. Hilster summarized, "[T]he[y] sent about 80 of us to New Hampshire for about three months.  And I took my wife and my middle child with me.  We stayed in Portsmouth."[9]  Plaintiffs omit this portion of Mr. Hilster's professional and residential chronology from their Opposition, perhaps because application of their choice of law position would mean that at least some portions of the "take-home" claims arising out of Mr. Hilster's Electric Boat employment should be governed by New Hampshire law.  And, of course, if the family had lived in Maine (or, presumably, even if they had just done their laundry there) rather than in New Hampshire during Mr. Hilster's time at the shipyard, or if they had relocated for a time from Connecticut to Rhode Island (less than 20 miles from Electric Boat), then plaintiffs' position would yield the absurd conclusion that those states' laws should apply as well.  In truth, making the duties of a supplier of equipment for installation aboard Navy nuclear submarines dependent on the location at which the spouse of a worker aboard those ships happened to launder his clothes would utterly frustrate the principles of uniformity that underlie maritime law.  The relevant interaction with Buffalo's product occurred under circumstances that support the application of maritime law, rather than the patchwork of different, and potentially inconsistent, legal standards plaintiffs' position would dictate.

### C.  Connecticut law would not excuse plaintiffs from having to prove exposure to asbestos from a product manufactured or supplied by Buffalo.

Even were it applicable, plaintiffs' suggestions regarding the substance of Connecticut law are misguided.  Notwithstanding the few trial court opinions plaintiffs cite, there is nothing to suggest that a proper application of Connecticut law to the facts of this case would countenance imposition upon Buffalo of any liability for external gaskets it did not supply,

---

[9] Hilster Dep Vol 1 (Exhibit C to Buffalo's Motion) 62:12-23.

beyond that enunciated by the Supreme Court in its explication of maritime common law on the issue in *DeVries*.  Moreover, plaintiffs' apparent suggestion that Connecticut law would support imposition of liability notwithstanding the absence of any evidence that any external gaskets Mr. Hilster encountered in the vicinity of Buffalo pumps contained asbestos is unsupported by any citation.  Indeed, in one of the cases plaintiffs themselves cite – *Olivar v. Buffalo Pumps, Inc.* – the court rejected an attempt by a plaintiff to use speculation by Captain Woodruff to fill in the blanks left by the factual testimony regarding what work might have been performed, on or near what Buffalo pumps, in what locations.  In *Olivar*, as here, Woodruff conceded he had no documentation as to what equipment might have been worked on, how often, or what the work might have entailed.

The court rejected Woodruff's attempts at surmise regarding those matters and plaintiff's attempt to "us[e] an *expert* witness to establish the *factual* (product identification and exposure) basis of her case."  Thus, notwithstanding documents reflecting that more than 70 Buffalo pumps were present aboard ships on which decedent worked, the court found that plaintiff had not met the Connecticut standard for proof of exposure sufficient to survive Buffalo's motion for summary judgment.  2011 U.S. Dist. LEXIS 160686 at *12-19 (E.D. Pa. Mar. 29, 2011), *adopted by* 2011 U.S. Dist. LEXIS 160677 (June 17, 2011).  In the instant case, Woodruff's speculation has even less foundation, as he has documented the presence of only a handful of Buffalo pumps that might have had asbestos internal gaskets on just five of the nineteen submarines on which Mr. Hilster worked.  He has provided no information regarding the specific locations of those

pumps aboard the submarines.  Plaintiffs offer no explanation as to how, even were the Court to apply Connecticut law, it would dictate a different outcome in this case than in *Olivar*.[10]

Plaintiffs also incorrectly assume that the standard for granting of summary judgment somehow will be dictated by Connecticut law.  Thus, they cite cases in which Connecticut trial courts denied motions for summary judgment based on the mere presence of a defendant's equipment aboard a ship, despite the absence of any evidence that plaintiffs ever encountered that equipment or were exposed to asbestos from it.  To the extent plaintiffs are suggesting that Connecticut law would require this Court to countenance such speculation in lieu of evidence, they overlook the fact that Buffalo's motion will be decided under federal summary judgment standards enunciated in Federal Rule of Civil Procedure 56 and the cases construing it, rather than under Connecticut procedure.  To the extent plaintiffs are even correct in their explication of Connecticut causation law, *Olivar* illustrates plaintiffs' inability to meet the burdens imposed on them by federal procedural law in opposing Buffalo's motion.  *Compare, e.g., Hammer v. A.L. Burbank & Co.*, 2013 Conn. Super. LEXIS 1769 at *3-4 (Aug. 19, 2013) ("apply[ing] the Connecticut standard relative to the parties' burdens on a motion for summary judgment").

**D.  Buffalo's government contractor defense is appropriate for summary judgment.**

As Buffalo anticipated in its motion, plaintiffs' arguments against Buffalo's entitlement to summary judgment based on the government contractor defense boil down to essentially an observation that Buffalo has not pointed to any specification in which the Navy expressly prohibited asbestos warnings.  They cite a litany of documents – without regard to whether they

---

[10] The *Olivar* court's application of Connecticut law to the claims of a Navy machinist predated its subsequent determination that claims arising out of such circumstances are in fact governed by maritime law rather than state law.  *See Conner v. Alfa Laval, Inc.*, 799 F. Supp. 2d 455 (E.D. Pa. 2011).

even pertained to pumps supplied for the nuclear submarines on which Mr. Hilster worked – for the alleged absence of such a requirement.  Moreover, while they acknowledge that the government contractor defense to a failure to warn claim is triggered when "the government *exercised its discretion* and approved the warnings, if any," (Pl. Opp. at 21 [citing *Tate v. Boeing Helicopters, Inc.* [emphasis supplied]), they then cite a 2006 district court decision from Virginia to suggest that the defense is unavailable "so long as the government does not mandate specific warnings or prohibit warnings. . . ."  (Pl. Opp. at 22 [citing *Epperson v. Northrup Grumman Sys. Corp.*]; *see also, e.g., id.* ["Buffalo has not met its burden to show that the Navy's specifications prohibited it from warning about the hazards of asbestos"][11]).  They do not acknowledge either the Third Circuit case law or the post-*Epperson* Fourth Circuit case law[12] endorsing the "discretion" standard rather than a requirement that the government have prohibited or dictated warnings.[13]  Plaintiffs' invocation of an erroneous legal standard leads them to comb through various documents looking for evidence of Navy dictation or prohibition of warnings.

In fact, as Buffalo demonstrated in its original motion papers, there is ample evidence of Navy discretion regarding both the design of Buffalo pumps aboard nuclear submarines and the content of documentation relating to those pumps.  Contrary to plaintiffs' narrow focus on Navy-generated specifications only, the Navy's exercise of discretion encompassed both the

---

[11] This quotation and other statements in the Opposition also suggest that, in order for the government contractor defense to apply, the Navy must have written the specifications.  In fact, *Boyle* requires that the government have "*approved* reasonably precise specifications" (emphasis supplied), not that it have drafted them.  In any event, here the Navy both issued the specifications that governed Buffalo's actions and approved the specific designs of its pumps and content of the documentation.

[12] *See, e.g., Sawyer v. Foster Wheeler LLC*, 860 F.3d 249 (4th Cir. 2017).

[13] As plaintiffs' quotation from it reveals, *Epperson* involved claims not against a manufacturer for injuries from an allegedly defective piece of equipment, but rather claims against a shipyard for failing to maintain safe working conditions.

preparation of such documents and the substantive review and approval of Buffalo's attempts to satisfy them.  Nowhere do plaintiffs in any way contradict Buffalo's description of the painstaking process by which the Navy's review and approval occurred.  Indeed, plaintiffs repeatedly suggest that, because it did not contain asbestos warnings, the documentation accompanying Buffalo's pumps somehow "violated" the Navy's specifications, which plaintiffs claim "required" such warnings.  Plaintiffs cite not a single statement by the Navy at the time the pumps were supplied, or at any time since, suggesting that the Navy believed Buffalo's documentation was deficient or failed in any respect to meet the Navy's specifications and requirements.  Quite the contrary, the testimony of both Captain Woodruff and of Buffalo's expert Admiral Sargent confirms that the Navy's acceptance of the documentation reflected that it *complied* in all respects with the Navy's requirements and expectations.

Plaintiffs' also note what they claim is a lack of "conflict between the state law duty to warn and military specifications."  However, neither *Boyle* nor its progeny makes a showing of a "conflict" a separate element of the government contractor defense.  Rather, as the cases Buffalo cited in its original motion papers demonstrate, the question is whether the government's review and approval equipment design and document content was sufficiently exacting to have constituted an exercise of government discretion, rather than a "rubber stamp."  Because, in the case of pumps Buffalo supplied for the nuclear submarines at issue, it was, the "conflict" for which plaintiffs are searching is between the items the government ordered Buffalo to deliver, and plaintiffs' suggestions that those items failed to meet some other, state-imposed, set of obligations.  As the Supreme Court and subsequent circuit courts have recognized, the government's interests in being able cost-effectively to obtain necessary items, including military

equipment, requires shielding from suit contractors who in good faith provide exactly what the government, in an exercise of its discretion, has declared it wants.

As discussed above and in Buffalo's original motion papers, the question of whether the Navy could have exercised its discretion so as to have accepted or insisted on some other version of manuals or drawings relating to equipment is irrelevant to the government contractor defense. Warnings and cautions indisputably were within the purview both of the Navy's specifications for documentation and its review to ensure conformity with those specifications. Buffalo's provision of documentation that complied with the Navy's instructions during that substantive, multi-layered review satisfies the first and second elements of *Boyle*. Plaintiffs may not undo that fact by now, more than 50 years later, attempting to claim – notwithstanding the Navy's conclusion at the time – that those items did not comply with the Navy's specifications.

With respect to *Boyle*'s third element – that Buffalo must have "warned the United States about the dangers in the use of the equipment that were known to [Buffalo] but not to the United States" – plaintiffs similarly offer no real evidence. Rather than address the actual requirement, they first argue that "[t]here is no evidence . . . that Buffalo ever had a reasonable belief that that the Navy was warning workers about the hazards of asbestos." Indeed, there is not, since there is no evidence that Buffalo, as opposed to the Navy, had any knowledge whatsoever of such hazards at any relevant time. Nor do *Boyle* and the line of cases construing it require any such showing. The pertinent question is simply whether Buffalo had, but did not disclose, information regarding potential hazards associated with its pumps that the Navy did not already have.

Plaintiffs argue strenuously that there exists some genuine issue of material fact regarding the relative knowledge of the Navy and Buffalo that should preclude entry of summary

judgment.  Without grappling with, or even acknowledging, the dozens of documents accompanying the declaration of Dr. Forman[14] showing the Navy's actual knowledge of asbestos hazards and appropriate methods to control exposure dating back to the 1922s, plaintiffs simply declare that "there is evidence that the Navy was unaware of the dangers of asbestos exposure until the 1970s."  (Pl. Opp. at 24).  In support of this remarkable proposition, they cite a 2004 deposition of Admiral Sargent.  A review of the transcript reveals that he was asked, "When did *you personally* first become aware of the potential hazard of asbestos and asbestos-containing products to those individuals who worked with it?" (Pl. Opp. Exh. 36 [emphasis supplied]). Plaintiffs offer no support for the proposition that the Navy's knowledge on a topic is to be measured, for purposes of the third prong of *Boyle*, by the recollection of every single Navy serviceman regarding his or her "personal" awareness.  Nor, even were that the standard, is there any evidence that Buffalo had any awareness on the subject even by the time Admiral Sargent recalled first hearing of it.

Elsewhere, plaintiffs make various assertions regarding Buffalo's purported "knowledge" of asbestos hazards.  However, despite plaintiffs' claim that Buffalo actually had such knowledge, a close review of their statements reveals either that they pertain (as in the case of statements by Captain Woodruff) to "industry" or to what "marine equipment vendors . . . should have known," or that they are allegations by plaintiffs that, for example, "Buffalo *would have* been aware about the dangers of asbestos because it advertised in publications that published articles on this topic."  (Pl. Opp. at 6 [emphasis supplied]).

*Boyle* does not require a comparison between what the Navy knew and this kind of speculation or conjecture regarding what Buffalo "could have" known; rather, the comparison is

---

[14] Exhibit K to Buffalo's Motion.

with what was actually "known to" Buffalo.  If Buffalo disclosed to the Navy what it actually

knew, if anything, about potential hazards, its provision of equipment and documentation in

compliance with the Navy's requirements, coupled with the Navy's manifest exercise of

discretion, exempts Buffalo from liability.  Plaintiffs also do not attempt to compare the content

of the information they claim Buffalo "could" or "should" have had with the Navy's

demonstrated extensive knowledge.  Buffalo only fails to satisfy the third prong of *Boyle* of its

knowledge *exceeded* that of the Navy.

Stripped to its essence, plaintiffs' argument against Buffalo's motion for summary

judgment on the government contractor defense is nothing more than a suggestion that the

decision of one district court in *Willis v. BWIP Int'l, Inc.* rendered the government contractor

defense forever beyond the reach of summary judgment.  (Plaintiffs also cite two other decisions

by the same court – *Aikins v. General Electric Co.* and *Sellers v. Air & Liquid Systems Corp.* –

which merely cite *Willis*.)  Plaintiffs make no attempt to square *Willis* with – indeed, they do not

even mention – subsequent authority from the Third Circuit or other federal circuit courts cited

by Buffalo.  *Willis* is not binding on this Court, of course; and even if it were, it would require

the same outcome only if it considered the same arguments and evidence as Buffalo has

presented in the instant case.

Neither the argument Buffalo is advancing nor the record evidence it has presented is the

same as that advanced by defendants in *Willis*.  While plaintiffs may have chosen to "rel[y] on

th[e] same evidence" on which plaintiffs relied in *Willis* (Pl. Opp. at 21), Buffalo has presented a

substantial amount of evidence not in the record there which demonstrates the exercise by the

Navy of discretion in approving both the design of Buffalo pumps on the submarines at issue and

all documentation accompanying them.  That evidence includes the testimony of Captain

Woodruff.  The importance of the content of the case-specific record to the determination of whether summary judgment is appropriate as to the government contractor defense is exemplified by the fact that the same court that denied summary judgment in *Willis* has also granted summary judgment on the issue.  *See Faddish v. General Elec. Co.*, 2010 WL 4146108 at *8-9 (E.D. Pa. Oct. 20, 2010).

### E.  <u>Conclusion</u>

For the foregoing reasons and those set forth in Buffalo's Motion and original Memorandum of Law, Buffalo is entitled to summary judgment in its favor as to all of plaintiffs' claims against it.

Respectfully submitted,

**WILBRAHAM, LAWLER & BUBA**

By: */s/  Jennifer E. Watson*
    Jennifer E. Watson, Esquire (I.D. No. 78664)
    603 Stanwix Street Suite 17 North
    Pittsburgh, PA 15222
    jwatson@wlbdeflaw.com
    412-255-0500
    Attorney for AIR & LIQUID SYSTEMS
    CORPORATION, SUCCESSOR BY MERGER TO
    BUFFALO PUMPS, INC.

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| SHIRLEY A. CARPIN, as Executor of the Estate of SHIRLEY A. HILSTER, deceased, and CHARLES W. HILSTER, JR., Individually, | ) ) ) ) | |
| Plaintiff, | ) ) | Civil Action No. 2:20-CV-1537-MJH |
| v. | ) ) | |
| AIR & LIQUID SYSTEMS CORPORATION, individually and as successor-in-interest to Buffalo Pumps, Inc., et al. | ) ) ) ) | |
| Defendants. | ) | |

## CERTIFICATE OF SERVICE

I hereby certify that March 29, 2022, I electronically filed the foregoing Reply Memorandum of Law in Support of Motion of Defendant Air & Liquid Systems Corporation for Summary Judgment with the Clerk of the Court using the CM/ECF system, and I hereby certify that I have thereby electronically served this document upon all counsel of record who are registered with the Court's CM/ECF system.

*/s/ Jennifer E. Watson*
Jennifer E. Watson, Esquire
Counsel for Defendant,
Air & Liquid Systems Corporation, successor by merger to Buffalo Pumps, Inc.