IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
PITTSBURGH

| | |
|---|---|
| SHIRLEY A. HILSTER, DECEASED; CHARLES W. HILSTER JR., INDIVIDUALLY; SHIRLEY A. CARPIN, AS EXECUTOR OF THE ESTATE OF SHIRLEY A. HILSTER, DECEASED; AND SHIRLEY A. HILSTER,<br><br>            Plaintiffs,<br><br>     vs.<br><br>AIR & LIQUID SYSTEMS CORPORATION, et al.,<br><br>            Defendants, | 2:20-CV-01537-MJH |

OPINION

Plaintiffs bring the within action against many Defendants for Shirley A. Hilster's asbestos-related injuries and death. Defendant, Air & Liquid Systems Corporation successor-by-merger to Buffalo Pumps, Inc. (collectively "Buffalo"), now moves for summary judgment pursuant to Fed. R. Civ. P. 56. (ECF Nos. 363). The matter is now ripe for consideration.

Upon Consideration of Buffalo's Motion for Summary Judgment (ECF Nos. 363), the respective briefs of the parties (ECF Nos. 364, 379, and 385), the arguments of counsel, and for the following reasons, Buffalo's Motion for Summary Judgment will be granted.

I. Background

Plaintiffs initiated this asbestos-related personal injury action, alleging that Shirley Hilster was exposed to asbestos from contact with her husband's work clothes and person when greeting him home, laundering his work clothes, and spending time in his vehicle. Plaintiffs allege Mr. Charles Hilster was employed as a pipefitter, hydraulic pipefitter, new construction

project manager and maintenance supervisor at various premises and naval shipyards from approximately 1958 to 1987 and 1989 to 1995. (ECF No. 1 at ¶¶ 114-118.)

Plaintiffs allege that Shirley Hilster was exposed to asbestos from laundering her husband's work clothing throughout their marriage (with the exception of when Mr. Hilster served in the Navy). Charles Hilster claimed that he was exposed to asbestos while working as a pipefitter apprentice, pipefitter, supervisor, foreman, piping supervisor, assistant project manager and project manager at various industrial facilities and naval shipyards beginning in 1957 and continuing into 1975. (ECF No. 320-1 at p. 12). Mr. Hilster testified that, during this time period, his wife Shirley would launder his work clothes and that she would have shaken them out prior to washing. (ECF No. 350-1 at p. 57:8-16). Shirley Hilster was diagnosed with malignant mesothelioma of the pleura in July 2020.  She died of this disease on October 11, 2020.

Plaintiffs aver claims of Negligence (Count I), Strict Liability (Count II), Breach of Implied Warranty (Count III), Negligence-Premises Liability (Count IV), Negligent Hiring, Training and/or Supervision of Defendant-Employees (Count V), Gross Negligence; Willful, Wanton, and Reckless Conduct (Count VI), False Representation (Count VII), Failure to Warn-Product Defendants (Count VIII), Failure to Warn-Premises Defendants (Count IX), Conspiracy, Concert of Action Damages (Count X), Wrongful Death (Count XI), and Survival (Count XII).

Buffalo moves for summary judgment on the basis that it is not liable under applicable maritime law, and because Plaintiffs have not established any causal connection between any product for which it is legally responsible and Mrs. Hilster's disease, and/or because it is immune under the government contractor defense.  Buffalo also moves for summary judgment on Plaintiffs' non-pecuniary and punitive damages claim.

II. Standard of Review

According to Federal Rule of Civil Procedure 56, a court must grant summary judgment where the moving party "shows that there is no genuine dispute as to any material fact" and the moving party "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  For a dispute to be genuine, there must be "a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party." *Moody v. Atl. City Bd. of Educ.*, 870 F.3d 206, 213 (3d Cir. 2017) (internal quotations omitted).  Additionally, for a factual dispute to be material, it must have an effect on the outcome of the suit.  *Id.*  In reviewing and evaluating the evidence to rule upon a motion for summary judgment, the court must "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the" non-moving party.  *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 265 (3d Cir. 2014) (internal quotations omitted).  However, where "the non-moving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,'" the moving party is entitled to judgment as a matter of law.  *Moody*, 870 F.3d at 213 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

"The movant has the burden of showing that there is no genuine issue of fact, but the plaintiff is not thereby relieved of his own burden of producing in turn evidence that would support a jury verdict." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).  "Discredited testimony is not normally considered a sufficient basis for drawing a contrary conclusion.  Instead, the plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Id.* at 256-57 (internal citation omitted).  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (internal citations omitted).  Judges are not "required to submit a question to a jury merely because some evidence has been introduced by the party having the burden of proof,

unless the evidence be of such a character that it would warrant the jury in finding a verdict in favor of the party." *Id.* at 251 (internal citation omitted).

III. Discussion

A. Liability for Third-Party External Gaskets used on Buffalo Pumps

Buffalo argues, inter alia, that Plaintiffs cannot establish Buffalo's liability for any asbestos exposure from third-party gaskets used alongside a Buffalo pump was a substantial factor in causing Shirley Hilster's mesothelioma. Plaintiffs contend that Buffalo sold its pumps with asbestos components and that Buffalo knew that asbestos gaskets and insulation would be used with its pumps.

1. Applicable Law

As an initial matter, the parties dispute as to whether maritime or Connecticut law applies to Plaintiffs' claims against Buffalo. Buffalo maintains that maritime law applies because Mr. Hilster's alleged exposure to asbestos was aboard Navy nuclear submarines being built and maintained at Electric Boat. In addition, Buffalo contends that the claims arising out of Mrs. Hislter's illness were caused by "a vessel on navigable water." Plaintiffs argue that Connecticut law applies because Connecticut has the greatest governmental interest in this case, and because Mrs. Hilster's exposures occurred in Connecticut.

Federal courts are authorized under the U.S. Constitution and by Congress to hear cases pertaining to admiralty and maritime jurisdiction. U.S. Const. art. III, § 2; 28 U.S.C. § 1333(1). A party seeking to invoke maritime jurisdiction in an asbestos-related claim under section 1333 must satisfy a locality and connection test. *Conner v. Alfa Laval, Inc.*, 799 F. Supp. 2d 455, 458–59 (E.D. Pa. 2011). The locality test "is satisfied as long as some portion of the asbestos exposure occurred on a vessel on navigable waters." *Id*. at 466. Work performed aboard a ship

that is docked or in "dry dock" at the shipyard is still considered to occur on navigable waters. *Conner*, 799 F. Supp. 2d at 466. The connection test is satisfied if (1) the exposure "had a potentially disruptive impact on maritime commerce" and (2) "the general character of the activity giving rise to the incident shows a substantial relationship to traditional maritime activity." *Id*. at 463 (citation omitted). Where an individual is exposed to asbestos while he is performing maintenance on equipment integral to the functioning of the vessel, this exposure could "potentially slow or frustrate the work being done on the vessel." *Id*. at 465 (quoting *John Crane, Inc. v. Jones*, 274 Va. 581, 650 S.E.2d 851, 854 (2007)).

Here, if Mr. Hilster was the injured party, maritime law would likely apply. However, the question of so-called bystander or take-home liability is less clear. Mrs. Hilster's alleged exposure did not occur on "navigable waters," shipyard, dock, or drydock. After review of the record of this particular case, this Court finds that it need not resolve that matter, as both maritime and Connecticut substantive law provide the same conclusion to resolve Buffalo's liability arguments.

2. Analysis

Buffalo argues that, under maritime law, it cannot be liable for third-party external gaskets affixed to its pumps. With regard to the liability of manufacturers and the use of third-party parts, the Supreme Court has held as follows:

> In the maritime tort context, we hold that a product manufacturer has a duty to warn when (i) its product requires incorporation of a part, (ii) the manufacturer knows or has reason to know that the integrated product is likely to be dangerous for its intended uses, and (iii) the manufacturer has no reason to believe that the product's users will realize that danger.

*Air & Liquid Sys. Corp. v. DeVries*, 139 S.Ct. 986, 996, 203 L.Ed.2d 373 (2019). As regards the first prong, *DeVries* clarified that "requires incorporation" includes when "(i) a manufacturer

5

directs that the part be incorporated; (ii) a manufacturer itself makes the product with a part that the manufacturer knows will require replacement with a similar part; or (iii) a product would be useless without the part." *Id*. at 995-6.

Connecticut Product Liability law similarly provides:

> (a) A product seller shall not be liable for harm that would not have occurred but for the fact that his product was altered or modified by a third party unless: (1) The alteration or modification was in accordance with the instructions or specifications of the product seller; (2) the alteration or modification was made with the consent of the product seller; or (3) the alteration or modification was the result of conduct that reasonably should have been anticipated by the product seller.

Conn. Gen. Stat. Ann. § 52-572p.

Here, the record undisputedly demonstrates that Plaintiffs have produced no evidence that Buffalo required that the external asbestos gaskets be applied for its pumps to function. Buffalo did not provide the external gaskets. The record establishes that either the Navy or Electric Boat chose the external gaskets, and they chose whether or not said gaskets contained asbestos or non-asbestos material. Indeed, Mr. Hilster testified that submarines sometimes used non-asbestos external gaskets on external pump flanges. Further, Buffalo tested its pumps, using rubber, and not asbestos, gaskets, prior to delivery in order assure both complied with applicable military specifications (MILSPECS). As regards external gaskets, the record does not establish any genuine issues of material fact, under a maritime analysis, that (i) Buffalo specified or directed the use of the external gaskets; or that (ii) Buffalo incorporated an asbestos-containing external gasket on its equipment, knowing that it would be necessary to replace the gasket with an identical or similar asbestos containing product; or that (iii) Buffalo's pump could not function without the use of an asbestos containing external gasket. Likewise, under a Connecticut law analysis, the record does not support that the use of external gaskets made from asbestos (1) was

in accordance with the instructions or specifications of Buffalo; or (2) was made with the consent of Buffalo; or (3) was the result of conduct that reasonably should have been anticipated by Buffalo.

Therefore, under either maritime or Connecticut law, Buffalo's Motion for Summary Judgment, as regard any liability for any asbestos exposure from external gaskets produced by third parties, will be granted.

### B.  Liability for Internal Gaskets within Buffalo Pumps

Aside from external gaskets, Buffalo maintains that Plaintiffs have not produced sufficient evidence that Mr. Hilster encountered any Buffalo Pumps which contained internal asbestos gaskets.  The record also reflects that some of the Buffalo pumps utilized non-asbestos internal gaskets.  (ECF No. 363-1 at ¶¶ 21-23, 25).  Plaintiffs contend that Mr. Hilster did encounter internal components which contained asbestos.

Mr. Hilster testified that he could not recall working near a Buffalo pump, or when and how he might have worked around a particular Buffalo pump on any particular vessel.  (ECF No. 363-2 at pp. 9-11; ECF No. 379-4 at p. 10).  He also testified that any of his experience involving Buffalo pumps would have been limited to third-party external components, which sometimes contained external asbestos gaskets.  *Id.*   In particular, Mr. Hilster recalled removing gasket material from Crane, Hoke, Edward, and Powell pumps.  (ECF No. 379-4).  Mr. Hilster offered no testimony that he worked upon internal asbestos containing components of pumps in general and/or of Buffalo pumps in particular, or that he removed external gaskets from Buffalo pumps.  Plaintiffs' proffered expert, retired Captain R. Bruce Woodruff, testified that he could not determine, from his review of Mr. Hilster's testimony and the records in this case, whether,

when, or how Mr. Hilster worked on any particular pump or vessel.  (ECF No. 364-6 at pp. 10, 13-15).

1. Applicable Law

As regards the internal gaskets within Buffalo pumps, the parties again do not agree on whether maritime or Connecticut law applies.  As above, the Court's disposition does not require resolution of that issue, because both legal frameworks require similar elements, whose analysis in this case leads to the same conclusion.

Under maritime law, "a plaintiff must show, for each defendant, that '(1) he was exposed to the defendant's product, and (2) the product was a substantial factor in causing the injury he suffered.' *Lindstrom v. A–C Prod. Liab. Trust*, 424 F.3d 488, 492 (6th Cir.2005); citing Stark v. Armstrong World Indus., Inc., 21 F.App'x 371, 375 (6th Cir.2001).

Under Connecticut law, a plaintiff asserting a claim for asbestos-related injuries must "1) identify an asbestos-containing product for which a defendant is responsible, 2) prove that he has suffered damages, and 3) prove that defendant's asbestos-containing product was a substantial factor in causing his damages." *Laposka v. Aurora Pump Co.*, 2004 WL 2222935, at *1 (Conn. Super. Sept. 14, 2004) (quoting *Roberts v. Owens-Corning Fiberglas Corp.*, 726 F. Supp. 172, 174 (W.D. Mich. 1989)).  "The plaintiff must produce evidence sufficient to support an inference that he inhaled asbestos dust from the defendant's product." *Drucker v. A.W. Chesterton Co.*, CV075006717S, 2009 WL 2231654, at *2 (Conn. Super. Ct. June 23, 2009) (citing *Peerman v. Georgia-Pacific Corporation*, 35 F.3rd 284, 287 (7th Cir.1994)).  A general recollection of a product cannot overcome a motion for summary judgment. *Gay v. A.O. Smith Corp.*, 2:19-CV-1311, 2021 WL 2652926, at *4 (W.D. Pa. June 28, 2021)   Further, "'[s]peculation does not create a genuine issue of fact; instead, it creates a false issue, the demolition of which is a

primary goal of summary judgment.'" *Lexington Ins. Co. v. W. Pa. Hosp.*, 423 F.3d 318, 333 (3d Cir. 2005) (quoting *Hedberg v. Ind. Bell Tel. Co., Inc.*, 47 F.3d 928, 932 (7th Cir.1995).

Here, the evidence and testimony of record do not connect any Buffalo-supplied asbestos containing product to Mr. Hilster without the insertion of speculation. On the vessels that Mr. Hilster worked on, there were some Buffalo pumps that contained asbestos and some that did not. The record does not establish any question of material fact that Mr. Hilster worked on a particular Buffalo pump that contained asbestos. Further, he has testified that he did not work on any internal components of the Buffalo pumps where the asbestos would have been located. Further, Mr. Hilster offered no evidence or testimony that he was present while others performed work on internal components of a Buffalo pump. While the record supports that Mr. Hilster may have removed third party external gaskets, which contained asbestos, he did not testify concerning his removal of external gaskets involving Buffalo pumps. Therefore, Plaintiffs have produced no evidence sufficient to establish any genuine issue of material fact that infers that Mr. Hilster was exposed to any asbestos containing material sold or supplied by Buffalo. Without direct or even circumstantial evidence that Mr. Hilster was definitively in the presence of a Buffalo product that contained asbestos, the jury would otherwise be invited to improperly speculate based upon such attenuated circumstances. Because no reasonable juror could find that a Buffalo product caused Mrs. Hilster's mesothelioma, Buffalo is entitled to summary judgment.

    C. Government Contractor Defense

Notwithstanding its argument on liability, Buffalo also maintains that it is entitled to summary judgment through the government contractor defense. Buffalo argues that it had to comply with military specifications in order for its product to be purchased and accepted by the Navy. It further contends that, during the relevant time period that Mr. Hilster worked at Electric

Boat, the Navy was aware of asbestos hazards to personnel. Plaintiffs contend that Buffalo has failed to meet its burden to demonstrate that it is entitled to summary judgment on said defense because Buffalo should have provided warnings to the Navy regarding its asbestos components. Buffalo responds that, even it had been aware of the asbestos hazards, all warnings and labeling were governed by the Navy's specifications and review.

The Supreme Court first articulated the so-called "government contractor defense" in *Boyle v. United Technologies Corporation*, 487 U.S. 500, 512 (1987). In order to protect the governmental interests it identified, the Court held that contractors must be exempted from liability, under state law, for design defects in military equipment when (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States. "The first two of these conditions assure that the suit is within the area where the policy of the 'discretionary function' would be frustrated – i.e., they assure that the design feature in question was considered by a Government officer, and not merely by the contractor itself. . ." *Id*. at 512.

With regard to failure to warn claims, the first prong of *Boyle* is altered to preclude liability where the government exercised discretion and approved the warnings. *See Tate v. Boeing Helicopters*, 55 F.3d 1150, 1157 (6th Cir. 1995). Courts require the government approval to "transcend rubber stamping" for the defense to shield a government contractor from liability for failure to warn. *Id*. at 1156–5. The choice of equipment-related warnings involves exercises of governmental discretion in the same way as does the selection of equipment design. *See Jurzec v. American Motors Corp.*, 856 F.2d 1116, 1118-19 (8th Cir. 1988); *Myslakowski v. U.S.*, 806 F.2d 94, 97-98 (6th Cir. 1986), *cert. denied*, 480 U.S. 948 (1987); *Nicholson v. United*

10

*Techs. Corp.*, 697 F. Supp. 598, 604 (D. Conn. 1988). As *Tate* observed, "[w]hen the government exercises its discretion and approves designs prepared by private contractors, it has an interest in insulating its contractors from liability for such design defects…Similarly, when the government exercises its discretion and approves warnings intended for users, it has an interest in insulating its contractors from state failure to warn tort liability." *Tate*, 55 F.3d at 1157 (citing *Boyle*, 487 U.S. at 511-12).

Thus, "[w]hen state law would otherwise impose liability for a failure to warn of dangers in using military equipment, that law is displaced if the contractor can show: (1) the United States exercised its discretion and approved the warnings, if any; (2) the contractor provided warnings that conformed to the approved warnings; and (3) the contractor warned the United States of the dangers in the equipment's use about which the contractor knew, but the United States did not." *Tate I*, 55 F.3d at 1157; *see also, e.g., Sawyer v. Foster Wheeler LLC,* 860 F.3d 249, 256 (4th Cir. 2017); *Leite v. Crane Co.*, 749 F.3d 1117, 1123 (9th Cir.), *cert. denied*, 135 S. Ct. 361 (2014).

Three witnesses, Buffalo employee Martin K. Kraft, retired Navy Rear Admiral David P. Sargent, and Plaintiffs' expert Captain Woodruff, have testified or attested regarding the Navy procurement process for pumps on the submarines where Mr. Hilster worked. RADM Sargent asserts that, since the 1950s, the Navy has developed MILSPECS, which present detailed descriptions of government procurement requirements. (ECF No. 364-7 at ¶ 21). MILSPECS include requirements such as chemical composition, dimensions, required testing and performance demonstrations, required labeling, and packaging and shipping requirements. *Id*. The Navy also required manufacturers of components, such as pumps, valves, and electrical equipment, to comply with technical specifications expressly detailed in the MILSPECS in order

11

for the Navy to accept the equipment. *Id*. at ¶ 23.  Specifications for any equipment intended for use aboard Navy ships was drafted, approved, and maintained by the Navy. *Id*. at ¶ 22.  Only the Navy could change or modify those specifications. *Id*.   According to RADM Sargent, "Buffalo Pumps equipment could not have been installed aboard Navy vessels unless that equipment was first determined by the Navy to be in conformity with all applicable Navy specifications and contractual requirements."  *Id*. at ¶ 39.  RADM Sargent also asserted that "[U]niformity and standardization of any communication, particularly safety information, are critical to the operation of the Navy or Navy ships." *Id*. at ¶ 38.

In addition to MILSPECS, nuclear submarines were also subject to the standards established by the Navy's Bureau of Ships (BUSHIPS).  Captain Woodruff testified that BUSHIPS had an on-site team that was also involved in the design, construction, overhaul and repair of nuclear warships, including the development of specifications of those ships and their equipment.  (ECF No.  364-5 at p. 6-8).

According to Mr. Kraft, MILSPECS "required Buffalo Pumps to submit for approval and acceptance by the federal government drafts of any manuals, drawings or other written materials required to be provided with regard to pumps it manufactured for the Navy."  (ECF No. 364-1 at ¶ 13).  Before equipment was shipped from Buffalo's facility, Navy personnel inspected all packaging and labeling to ensure compliance with the Navy's specifications and requirements, and that the Navy's payment and acceptance of a product confirms that all specifications, standards, and contract requirements have been met.  (ECF No. 364-7 at ¶¶ 40-43 and ECF No. ECF 364-1 at ¶ 16).

With regard to the Navy's awareness of asbestos hazards to personnel, Buffalo Pumps has proffered Samuel A. Forman, M.D., a former Navy officer who is board certified in

occupational medicine.  (ECF No. 364-11 at ¶ 1).  Dr. Forman asserts that Navy has been aware of the potential hazards of asbestos-containing products since the 1920s and that such knowledge continued to expand over the next several decades. *Id*. at ¶¶ 20-47.   In contrast, Buffalo asserts that it has no documentation from its historical records to reflect that it had any awareness of any potential hazard associated with exposure to asbestos at any time during the 1950s and 1960s.  (ECF No. 364-1 at ¶¶ 34-35).   Plaintiffs have argued that Buffalo knew or should have known about the hazards of asbestos based upon an industry awareness at the time. On this last point, Plaintiffs contend there exist genuine issues of material fact with regard to whether the Navy had sufficient awareness of the dangers of asbestos exposure or that its awareness was superior to Buffalo.   Plaintiffs' arguments are unavailing as they have not proffered any evidence that disputes the documentation referenced by Dr. Forman regarding the Navy's historical awareness of asbestos health hazards.   Further, Plaintiffs have not provided any documentation, or lay or expert witness, that disputes Buffalo's assertions with regard to the awareness of asbestos hazards.

  Here, the undisputed record demonstrates that the United States Navy approved reasonably precise specifications involving an extensive procurement and approval process, including MILSPECS with regard to design, materials, and labeling for Buffalo, from which Buffalo would have had no discretion to waver.   The record also demonstrates that the Navy's acceptance of Buffalo pumps, after extensive inspections and review, indicates that said pumps conformed to the Navy's specifications.   Finally, the record demonstrates that, at the time it accepted of the Buffalo pumps in the 1950s and 1960s, the United States Navy knew of the potential dangers of asbestos-containing products.   Therefore, the Court finds no genuine issue

of material fact with regard to Buffalo's government contractor defense and that Buffalo has met the three elements under *Boyle* to succeed in this affirmative defense.

As regards the government contract defense for Plaintiffs' failure to warn claims, both RADM Sargent and Captain Woodruff agree the Navy determined the contents of all technical manuals, including any cautionary language through an extensive exchange with vendors, such as Buffalo. (ECF No. 369-6 at p. 17 and ECF No. 369-8 at ¶ 35). The record establishes that the Navy maintained an extensive process and exercised its discretion regarding the documentation, which would include safety information and warnings, related to Buffalo pumps. Plaintiffs offer no contrary evidence regarding this process undertaken by the Navy with regard to specifications and with regard to manuals, warnings, or any other written materials. While Plaintiffs contend that Buffalo violated the Navy's specifications in failing to warn of asbestos containing products, Plaintiffs have offered no statement or evidence that, at the time Buffalo supplied pumps or any time after, the Navy suggested any deficiencies or that Buffalo failed in any respect to meet the Navy's specifications and requirements. Plaintiffs cannot dispute those warnings and cautions were within the purview of both the Navy's specifications for documentation and its review to ensure conformity with those specifications. Buffalo's compliance with the Navy's instructions during a robust, substantive, and multi-layered review satisfy *Boyle*'s first and second elements. With regards to *Boyle*'s third element, just as under the Court's design defect analysis, Plaintiffs offer no evidence to refute that Buffalo had any knowledge of asbestos hazards or that the Navy did not have ample or superior knowledge of asbestos hazards. Therefore, the Court finds no genuine issue of material fact with regard to Buffalo's government contractor defense for Plaintiffs' failure to warn claims, and that Buffalo has met the three elements under *Boyle* to succeed in this affirmative defense.

Accordingly, in addition to granting Buffalo's summary judgment against Plaintiffs' claims for liability, Buffalo is also entitled to summary judgment against Plaintiffs by virtue of the government contractor defense. In so far as judgment will be entered in favor of Buffalo, the Court will not address the parties' remaining arguments regarding non-pecuniary and punitive damages.

IV.   Conclusion

Accordingly, based upon the foregoing, Buffalo's Motion for Summary Judgment will be granted. Judgment will be entered in favor of Buffalo and against the Plaintiffs. A separate order will follow.

DATED this 27th day of May, 2022.

BY THE COURT:

MARILYN J. HORAN
United States District Judge